# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 71034-6-I |
| Respondent, | ) | |
| | ) | DIVISION ONE |
| v. | ) | |
| | ) | |
| ROBERT ALLAN BAKER, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | FILED: November 9, 2015 |
| | ) | |

LAU, J. — A jury convicted Robert Baker of first degree premeditated murder with a deadly weapon enhancement and aggravating circumstances. He contends that (1) police officers violated his constitutional rights under the Fifth Amendment of the United States Constitution and article I, section 9 of the Washington State Constitution by questioning him after he invoked his right to remain silent; (2) the court improperly imposed an exceptional sentence based on victim vulnerability; and (3) his attorney's complete silence at sentencing constitutes ineffective assistance. We conclude no violation of Baker's right to remain silent occurred and the trial court properly imposed an exceptional sentence based on victim vulnerability. We affirm Baker's conviction.

Because Baker's counsel completely abandoned him at sentencing by remaining silent, prejudice is presumed. We remand to the trial court with instructions that Baker must be resentenced with assistance of competent counsel. We affirm the conviction and remand for resentencing in accordance with this opinion.

## FACTS

Kathie Baker lived with her husband, Robert Baker[1] on a wooded, 13-acre property in Greenbank, Washington.

In June 2011, Kathie and Baker opened Harbor Pizzeria restaurant. They both worked almost daily at the restaurant. Kathie also worked as an engineer for Raytheon Corporation. Kathie telecommuted most of the time because Raytheon Corporation is located in Denver. She occasionally traveled for work.

Kathie was last seen alive on June 2, 2012, when she and Baker celebrated their restaurant's one-year anniversary.

That evening, two employees from Harbor Pizzeria phoned the Baker residence. One employee spoke with both Baker and Kathie on the phone. At around 10:30 pm another employee spoke with Baker on the phone and Kathie was part of the conversation in the background. No one heard from Kathie after this phone call.

Raytheon employee Ray Dunham was unable to reach Kathie after calling her on June 4, 5, 6, and 7. Dunham's last contact with Kathie was on June 1 when she texted that she was with her "hubby." Report of Proceedings (RP) (Oct. 8, 2013) at 270.

On June 7, 2012, a different Raytheon employee tried to contact Kathie at Harbor Pizzeria. He was told that Kathie was in Colorado. Dunham knew that Kathie was not

---

[1] For clarity, we refer to Kathie Baker as "Kathie" in this opinion.

in Colorado and informed the company. Raytheon security contacted the Island County Sheriff's Office on June 7, 2012.

Police Investigation

On June 7, Lieutenant Evan Tingstad and Deputy Leif Haugen were dispatched to the Bakers' home to perform a welfare check. They contacted Baker around 4:45 pm by his mailbox. Baker told the officers that Kathie was in Denver for work and left on Saturday, June 2. Baker told the officers he last talked to Kathie when he dropped her off at SeaTac airport on Saturday, June 2. The deputies noticed a female's silhouette inside the house.

Baker said the person inside was a mutual friend named Lisa Schuldt. He said Kathie agreed to let Schuldt stay at the home. Baker gave Lieutenant Tingstad Kathie's cell phone number. He called it and left a message. On June 8, Detective Laura Price talked to Baker at Harbor Pizzeria. Schuldt was also present. He agreed to talk with Detective Price at the station. Detective Price and Baker drove separately to the station.

Detective Price suspected that Kathie left Baker and made a withdrawal from their bank accounts. Detective Price and Baker reviewed some of the couple's joint accounts. Baker forgot some of his passwords. He agreed to return home with Detective Price so they could view the remaining accounts there.

Between 3:30 p.m. and 4:40 p.m. that afternoon, Baker, Schuldt, Detective Price, and Deputy Haugen arrived at Baker's house. Baker drove separately.

Baker invited Detective Price into the house. She noticed the home was neat and clean except for a stain on the living room carpet. Baker explained a dog dragged its rear on the carpet.

Detective Price asked if she could look around to see if Kathie was in the house. She told Baker he could refuse permission. Baker agreed and led Detective Price into the master bedroom. Detective Price saw a red carpet stain partially concealed by a pillow. Baker said his dogs often relieved themselves on the carpet, and one of the dogs had a sore, bleeding paw. An inspection of the two dogs showed no bleeding paws or observable sores.

Lieutenant Tingstad asked Baker to go through the preceding two weeks with "specific clarity" to help police locate Kathie. RP (Oct. 9, 2013) at 529-30. Baker told Lieutenant Tingstad that he took Kathie to SeaTac airport on Sunday, June 3, and dropped her off for a flight to Denver. He said Kathie moved out and was living in Denver. He never explained why Kathie's dogs were in the house and her car in the garage.

Lieutenant Tingstad noted what he thought might be faint drag marks in the kitchen, into the garage, and from there to an outside door. He saw a white comforter in a sink in the garage with a red stain.

Lieutenant Tingstad and Baker stood outside in the driveway. Lieutenant Tingstad was concerned about a violent act in the home and wanted to ask "some direct questions." RP (Aug. 16, 2013) at 35-36. He advised Baker of his Miranda[2] rights. Lieutenant Tingstad said Baker was not in custody at this time. At first, Baker agreed to

---

[2] Miranda v. Arizona, 384 U.S. 436, 479, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

speak. After Lieutenant Tingstad asked him to explain the blood on the comforter Baker declined, "I don't think I want to answer any more questions." RP (Aug. 16, 2013) at 37. Lieutenant Tingstad discontinued questioning.

Baker was told he could not reenter the house pending application for a search warrant. No one told Baker to remain. He was not hand cuffed, placed in a patrol car, threatened, or promised anything. Lieutenant Tingstad asked Officer Haugen to "keep an eye" on Baker for officer safety as he waited outside. RP (Aug. 16, 2013) at 37.

Baker stood next to his pickup truck. After roughly three hours he was asked to leave and given identification, a credit card, and a jacket. Baker said he would be staying at the Harbor Pizzeria. He left in a taxi.

On June 9, after obtaining a search warrant for the Baker property, police discovered a body wrapped in a blue tarp hidden in a wooded ravine on the property. The body was covered with pieces of carpet, vegetation, a rain poncho, and a welcome mat.

Later that day, Lieutenant Tingstad and Deputy Haugen tried to locate Baker at Harbor Pizzeria. He was not there. Lieutenant Tingstad checked at a local motel in Freeland where Baker booked a room. Shortly before noon, Deputy Haugen went to Baker's room. Baker agreed to talk to officers about Kathie. He finished dressing and rode with officers to the station. He was not hand cuffed, arrested, or ordered to go with them.

At the station, Baker wrote out a statement after officers advised him of his Miranda rights and he waived those rights.

Baker's statement said he was romantically involved with Schmidt without Kathie's knowledge. He denied knowledge of when Kathie left. He denied that he and Kathie got into a physical fight. He wrote that "most of the stories I told you yesterday were not true. I had two stories for two women." Exhibit (Ex.) at 368. Baker claimed he noticed Kathie was gone on Sunday morning, June 3. He denied knowledge of the stains in the house. He stated the comforter in the laundry room was already there when he returned home.

Lieutenant Tingstad asked Baker follow up questions. He wrote the questions and answers on the form, which Baker initialed. Lieutenant Tingstad also asked Baker questions that were not written on the form. About an hour after beginning the written statement, Baker declined to answer any more questions and was arrested.

The Washington State Patrol Crime Scene Response Team discovered significant amounts of Kathie's blood in the home. Blood was discovered on the carpet, the mattress in the master bedroom, Kathie's nightstand, and the mattress pad. Evidence showed that Kathie's body had been dragged from the bedroom through the house, downstairs, through the garage, and then outside. The team discovered blood on the comforter in the garage, along with a mop and a bucket containing bloody water. Evidence also showed efforts made to clean up the blood.

The team discovered a hammer in the trash with hairs on the flat head and a carpet cleaner containing blood. An autopsy revealed that Kathie suffered a head injury caused by blunt force trauma, which an expert described as a "punched out, circular hole in the skull just beneath those two lacerations." RP (Oct. 9, 2013) at 602; Ex. at 254. An expert opined that the trauma was the result of at least two blows. The

autopsy further revealed evidence of strangulation. There was no evidence of defensive wounds. The medical examiner concluded the cause of death was blunt force trauma and ligature strangulation.

The State charged Baker with first degree murder committed with premeditated intent. The charge included a deadly weapon enhancement and the aggravating factor of the victim's particular vulnerability.

A jury convicted Baker as charged. He appeals.

ANALYSIS

## Miranda

Baker contends that the State improperly elicited statements from him after he invoked his right to remain silent.

When a suspect is questioned by police, he has the right to cut off questioning at any time by making an unequivocal statement of his desire to cease communication with interrogating officers. State v. Piatnitsky, 180 Wn.2d 407, 412, 325 P.3d 167 (2014); Miranda v. Arizona, 384 U.S. 436, 479, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966); U.S. CONST. amend. V; WASH. CONST. art. I, § 9. Where a suspect initially waives the right to silence, he retains the right to cut off questioning at any time. Miranda, 384 U.S. at 474.

Compliance with Miranda is required when a defendant's statement is the product of custodial interrogation. A suspect is in custody once his or her freedom of action is curtailed to a degree associated with formal arrest. Berkemer v. McCarty, 468 U.S. 420, 440, 104 S. Ct. 3138, 82 L. Ed. 2d 317 (1984). Custody is determined by looking at whether a reasonable person in the suspect's position would have felt his or

her freedom was curtailed to a degree associated with a formal arrest. State v. Daniels, 160 Wn.2d 256, 266, 156 P.3d 905 (2007); State v. Heritage, 152 Wn.2d 210, 217-18, 95 P.3d 345 (2004); Yarborough v. Alvarado, 541 U.S. 652, 662, 124 S. Ct. 2140, 158 L. Ed. 2d 938 (2004).

<u>Sufficiency of the Evidence</u>

The trial court entered comprehensive written findings of fact and conclusions of law after an evidentiary hearing pursuant to CrR 3.5. Baker challenges findings of fact 5, 15, 19, and 28 as "erroneously entered" and "incorrect." Br. of Appellant at 15.

> 5. The defendant answered questions knowingly, intelligently and voluntarily. The defendant did not request an attorney or ask the officers to halt their questioning.
>
> . . . .
>
> 15. The defendant answered questions both at Harbor Pizza and his residence knowingly, intelligently and voluntarily. The defendant did not request an attorney or ask the deputies to halt their questioning or their search of the residence. The defendant did ask the deputies not to look in the guest room where his houseguest, Lisa Schuldt, was staying. The deputies complied with the defendant's request.
>
> . . . .
>
> 19. After spending three hours standing at his truck in the driveway, the defendant left the scene in a taxi at approximately 10:00 pm. The defendant was not told where to go and the deputies did not know where the defendant was going.
>
> . . . .
>
> 28. The defendant was then placed under arrest and was not asked any further questions. Prior to being told he was under arrest on June 9, 2012, the defendant was not subject to photographing, fingerprinting or any other booking procedure. None of the interviews were overly long nor did they take place at off hours, nor were the deputies aggressive in their questioning. The defendant was not handcuffed while making any statement.

CP at 43-47.

On review, this court looks to whether a trial court's findings are supported by substantial evidence and whether those findings support the conclusions of law. State

v. Broadway, 133 Wn.2d 118, 130-31, 942 P.2d 363 (1997). Substantial evidence is evidence sufficient to persuade a fair-minded, rational person of the truth of the premise asserted. State v. Halstien, 122 Wn.2d 109, 128, 857 P.2d 270 (1993). Unchallenged findings, and findings supported by substantial evidence are verities on appeal. State v. Homan, 181 Wn.2d 102, 106, 330 P.3d 182 (2014). Credibility determinations are for the trial court and will not be disturbed on appeal. State v. O'Neal, 126 Wn. App. 395, 419, 109 P.3d 429 (2005).

To the extent that Baker challenges whether substantial evidence exists to support findings of fact 5, 15, 19 and 28, those findings are amply supported by the record in this case. The trial court's findings of fact constitute verities on appeal.

On June 7, sheriff deputies were dispatched to Baker's residence to do a welfare check on Kathie. Her employer had not heard from her since June 1. Baker voluntarily talked to the sheriff's deputies outside of the residence about her whereabouts. The entire contact with the deputies was about 12 minutes.

On June 8, Detective Price contacted Baker at Harbor Pizzeria. Baker agreed to talk to Detective Price at the nearby station. He drove himself to the station. There, he talked to Detective Price for about 30 minutes in a conference room with the door open. He was not "under any particular suspicion for anything." RP (Aug. 16, 2013) at 13-14.

Baker agreed to meet Detective Price at his residence. He drove his car home with Schuldt. He brought his laptops to the kitchen where they looked at information and continued to talk about Kathie's absence. After Baker was told he could refuse or limit the search, Baker agreed to a search of his home. He led Detective Price through the house. When he asked them not to enter Schmidt's room, they complied.

Lieutenant Tingstad read Baker his Miranda rights when deputies thought they might be "investigating a criminal offense." RP (Aug. 16, 2013) at 35. They stopped questioning Baker at 6:30 p.m. when he declined to answer any more questions. Baker was not detained. They told him not to go back into the house while deputies applied for a search warrant. For officer safety, Lieutenant Tingstad asked Deputy Haugen to "keep an eye on Mr. Baker" while deputies continued their investigation.

No one made threats or promises to Baker. He understood the questions. Deputies did not place Baker in handcuffs, a patrol car, or detain him. "We basically didn't do anything with Mr. Baker" after he said he did not want to talk. RP (Aug. 16, 2013) at 38. He just stood by his car for about three hours as deputies continued their investigation. No one restricted his movements or told him "he couldn't go anywhere." RP (Aug. 16, 2013) at 38.

Deputies told Baker to leave, police personnel would be at the house, and no one would be allowed to come or go into the home. Lieutenant Tingstad offered to get Baker's identification, jacket, and a credit card. A deputy brought Baker these items. A deputy or Baker called for a taxi cab. No one restricted where he could go. He told deputies he would stay at the pizzeria when they asked how to contact him.

On June 9, about 18 hours after Baker left in a taxi and about 21 hours after Lieutenant Tingstad asked his last question, deputies contacted Baker at a motel room around noon. They knocked on the door and Baker agreed to talk to them. Deputies drove him to the precinct. He was not placed in handcuffs or restrained.

They sat in a conference room and offered Baker water and coffee. Lieutenant Tingstad asked him "if we could talk about where his wife was." RP (Aug. 16, 2013) at

42. Baker agreed to talk to the deputies. Lieutenant Tingstad placed a preprinted form on the table and read Baker his <u>Miranda</u> rights as Baker followed along. He indicated he understood his rights. He placed his initials next to each right. Baker signed the waiver, indicating he understood his rights, wished to waive the rights, and provide a written statement. Baker asked clarifying questions about his rights including whether he could talk now and later invoke his rights. Lieutenant Tingstad told him that he could.

Lieutenant Tingstad explained that he was confused about the information they obtained yesterday. He asked Baker "if we could sit down and go over the events and find out where Kathie was." RP (Aug. 16, 2013) at 46. "[Baker] stated that he would." RP (Aug. 16, 2013) at 46. Baker said he wanted to write his own statement. Lieutenant Tingstad left the door open, walked out, and left Baker alone in the room to write out his statement.

When Baker said he was finished, 15 to 20 minutes later, Lieutenant Tingstad and Detective Haugen returned to the room, read Baker's statement, and asked Baker some questions. They arrested Baker when he declined to answer any more questions. The entire contact at the precinct was one hour.

We conclude that substantial evidence supports the trial court's findings of fact.[3]

In a statement of additional authorities, Baker relies on <u>United States v. Borostowski</u>, 775 F.3d 851 (7th Cir. 2014). This case is distinguishable. There, the court concluded that defendant was in police custody when 13 law enforcement officers executed a search warrant at the defendant's home at approximately 6:00 a.m. The

---

[3] Detective Laura Price, Lieutenant Evan Tingstad, and Deputy Leif Haugen testified at the CrR 3.5 hearing. The trial court found their testimony was credible.

initial entry team consisted of seven agents armed with handguns, including one who carried a ballistic shield. The agents ordered the defendant to place his hands on his head, escorted him to the front lawn, and handcuffed him. Once the home was secure, the defendant was brought back into a room. An agent stood between him and the door. Over the next three hours, eleven officers searched the home and questioned the defendant. During his interactions with the officers, the defendant three times requested an attorney. The agents asked if the defendant would submit to a polygraph. When he agreed, they drove him 52 miles restrained with handcuffs and leg shackles. The court considered several factors in concluding that a reasonable person in the defendant's position would not feel free to terminate the encounter and walk away. Borostowski, 775 F.3d at 863. Among those factors were the presence of armed officers controlling the defendant's actions, the use of physical restraints like handcuffs and shackles, that the suspect was confined in a small room, whether the defendant voluntarily agreed to meet with officers, and that the defendant was not released at the end of the encounter. Borostowski, 775 F.3d at 860-62.

Unlike in Borostowski, Baker voluntarily escorted police around his home, was never restrained, and freely departed with no police intervention. A suspect is not placed in custody merely because he is not allowed to enter his residence. State v. Lorenz, 152 Wn.2d 22, 37-38, 93 P.3d 133 (2004) (fact that defendant was not allowed into her trailer during police search did not place her in "custody" for Miranda purposes because she was not required to remain on the premises).

Baker was not in custody on June 9 when police located him at the motel nearly 18 hours after Baker left in a taxi the prior evening, and nearly 21 hours after he was

-12-

last asked a question. During this interval, Baker was free to go anywhere except to his residence. The deputies asked him if he would be willing to go to the station. He agreed. Because Baker left the prior night without his vehicle, officers gave him a ride to the station. Baker was frisked for officer safety before getting into the police vehicle. He was not handcuffed and rode as a passenger. He was offered water or coffee in the conference room and no booking procedures were performed. Baker asked questions about his rights and Lieutenant Tingstad properly responded. Baker was alone in the room to write his statement.

The mere fact that a defendant willingly goes to a police station does not transform an interaction with police into a custodial encounter. The Supreme Court has "explicitly recognized that Miranda warnings are not required 'simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect.'" California v. Beheler, 463 U.S. 1121, 1125, 103 S. Ct. 3517, 77 L. Ed. 2d 1275 (1983) (quoting Oregon v. Mathiason, 429 U.S. 492, 97 S. Ct. 711, 50 L. Ed. 2d 714 (1977)).

We conclude there was substantial evidence that a reasonable person in Baker's position would not consider his freedom curtailed to a degree associated with formal arrest. Because Baker was not in custody at the time of questioning, we are not persuaded by his claim that police violated his right to silence. But even if we assume that Baker was in custody, the record shows that law enforcement officers scrupulously honored his invocation of the right to remain silent.

## Invocation of Right to Silence

Baker argues that on June 8 at about 6:30 p.m., he properly invoked his right to remain silent when he told Lieutenant Tingstad "I don't think I want to answer any questions—any more questions." RP (August 16, 2013) at 37, 40. He asserts that when officers located him around noon the next day at the motel they were not free to disregard his earlier invocation of his right to silence.[4]

Baker relies principally on Michigan v. Mosley, 423 U.S. 96, 96 S. Ct. 321, 46 L. Ed. 2d 313 (1975), arguing that police may not reinitiate questioning once the right to silence has been invoked. In that case, police arrested Mosley for several robberies of a local bar and diner. Officers advised him of his Miranda rights and questioned him. Mosley invoked his right not to answer any questions. Police promptly ceased questioning and confined him. More than two hours later, a different detective questioned Mosley about a homicide unrelated to the robberies. The detective gave new Miranda warnings. Mosley made incriminating statements. He was charged and convicted of the murder.

On appeal, Mosley claimed officers could not resume questioning after he invoked his right to silence. The Supreme Court disagreed. The Court held that the critical safeguard of the right to silence is the right to cut off questioning. Mosley, 423 U.S. at 103. The Court noted that in each instance, officers carefully advised Mosley of his rights and immediately cut off questioning when Mosley indicated he no longer wished to answer questions. It explained that this was not a case where officers failed

---

[4] The trial court entered alternative conclusions of law that Baker was fully advised of his Miranda rights, that he acknowledged those rights, that the officers honored his request to cut off questioning, and that there was a significant "cooling off period" between questioning. CP at 47-48.

-14-

to honor a defendant's rights, refused to discontinue questioning upon request, or tried to wear down the defendant's resistance with persistent questioning:

> In contrast to such practices, the police here immediately ceased the interrogation, resumed questioning only after the passage of a significant period of time and the provision of a fresh set of warnings, and restricted the second interrogation to a crime that had not been a subject of the earlier interrogation.

Mosley, 423 U.S. at 106. Mosely supports admissibility of Baker's statements.

Baker points out that Mosley was questioned about an unrelated crime. Unlike in Mosley, Baker argues that he was questioned about the same crime after he had "been questioned at length by the police for many hours as the police narrowed their investigation to believe he committed a 'violent act' in his home against his wife." Br. of Appellant at 13. He argues that his final "Mirandized statements came after a long day of police questioning, including barring him from his home or from accessing his personal property." Br. of Appellant at 15.

Admissibility under Mosley depends on the absence of evidence of "attempted persuasion" through efforts to wear down the defendant. Later cases interpret Mosley as prohibiting law enforcement efforts to overcome a defendant's right to silence, not as a per se bar on questioning related to the same subject. See Kelly v. Lynaugh, 862 F.2d 1126, 1131 (5th Cir. 1988) ("it is not decisive that the interrogations covered the same crime"); United States v. Hsu, 852 F.2d 407, 409-12 (9th Cir. 1988) (law enforcement "scrupulously honored" defendant's rights where he was twice questioned about the same crime in a short period but interrogation promptly ceased when defendant asserted right (quoting Miranda, 384 U.S. at 479)). The critical factor is a

"cooling off" period followed by a fresh set of warnings. Hill v. Kemp, 833 F.2d 927, 929 (11th Cir. 1987); Hsu, 852 F.2d at 411.

Washington follows the "cooling off" period approach. For instance, in State v. Robbins, 15 Wn. App. 108, 547 P.2d 108 (1976), the defendant was taken into custody on a Friday. Police gave proper Miranda warnings and the defendant invoked her right to silence. The following Monday, after giving a fresh set of Miranda warnings, police resumed questioning about the same crime. The defendant signed a written confession. We held that nothing about the defendant's weekend incarceration or questioning about the same subject matter, suggested the police refused to take "no" for an answer. Robbins, 15 Wn. App. at 109-13. We concluded no violation of the defendant's rights occurred.

Similarly, in State v. Vannoy, 25 Wn. App. 464, 610 P.2d 380 (1980), officers promptly halted questioning where a defendant asserted his right to remain silent. About four hours later, the defendant was given new Miranda warnings, waived his rights, and signed a confession. Vannoy, 25 Wn. App. at 469. We determined that there was nothing in the record suggesting the intent of the second interrogation was to wear down the defendant and thus force him to change his mind. Vannoy, 25 Wn. App. at 469.

Baker contends that once a defendant makes it clear he wishes to cut off questioning, police may not resume interrogation about the same criminal investigation "unless the accused himself initiates further communication, exchanges, or conversations with the police," citing Edwards v. Arizona, 451 U.S. 477, 485, 101 S. Ct. 1880, 68 L. Ed. 2d 378 (1981). Edwards is inapposite. That case involved a

defendant's Fifth Amendment right to counsel. Edwards, 451 U.S. at 485. Likewise, Baker's reliance on Maryland v. Shatzer, 559 U.S. 98, 130 S. Ct. 1213, 175 L. Ed. 2d 1045 (2010) is misplaced.[5] In that case, the court concluded that once a defendant invokes his right to counsel under the Fifth Amendment, police must wait 14 days before questioning the defendant again without counsel present. Shatzer, 559 U.S. 110-11. Baker makes no claim that he requested the assistance of an attorney at any point during the police investigation preceding his arrest.

Assuming Baker was in custody, no constitutional rights were violated. The second round of questioning occurred nearly 18 hours after he left his home the previous night in a taxi, unescorted by police, and 21 hours after the last question was asked. He spent the night in a motel after telling police he would stay at his pizza restaurant. The following afternoon he was given new Miranda warnings. Nothing in the record indicates that officers failed to scrupulously honor Baker's invocation of his rights. At trial, Baker admitted he was under no pressure to make his written statement. We conclude the trial court properly admitted Baker's statements made to police officers.[6]

Finally, even assuming error in the admission of Baker's statements to police officers, the error is harmless beyond a reasonable doubt. The remaining overwhelming

---

[5] Baker included this case in a statement of additional authorities filed after oral argument.

[6] Baker argues that article I, section 9 of the Washington State Constitution is more protective of the right to remain silent than the 5th Amendment of the United States Constitution. We disagree. Well settled authority holds that Article I, Section 9 of the Washington State Constitution provides no greater protection than the Fifth Amendment of the United States Constitution. State v. Mecca Twin Theater & Film Exch., Inc., 82 Wn.2d 87, 91, 507 P.2d 1165 (1973); In re Pers. Restraint of Ecklund, 139 Wn.2d 166, 172, 985 P.2d 342 (1999); State v. Terry, 181 Wn. App. 880, 889, P.3d 932 (2014).

untainted evidence of guilt, summarized above, establishes guilt beyond a reasonable doubt.

### Particularly Vulnerable Person Aggravator

Baker contends that the State failed to establish that Kathie was a particularly vulnerable victim of premeditated murder beyond a reasonable doubt. He asserts two main grounds: first, there was insufficient evidence to support a jury's finding that Kathie was particularly vulnerable or incapable of resistance when she was murdered. Second, the particularly vulnerable person aggravator is incompatible with a charge of murder in the first degree.

The State charged Baker with the aggravating factor that he knew or should have known the victim was particularly vulnerable or incapable of resistance. The court instructed the jury that the aggravator must be proved beyond a reasonable doubt and:

> If you find the defendant guilty of Murder in the First Degree, then you must determine if the following aggravating circumstance exists:
>
> Whether the defendant knew or should have known that the victim was particularly vulnerable or incapable of resistance.

CP at 33.

### Sufficiency of the Evidence

The prosecution bears the burden of proving the essential elements of a crime. In re Winship, 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970). We review a challenge to the sufficiency of the evidence supporting an aggravating circumstance under the same standard applied to guilty verdicts. State v. Chanthabouly, 164 Wn. App. 104, 142-43, 262 P.3d 144 (2011). We view the evidence in the light most favorable to the State to determine whether any rational trier of fact could have found

the presence of the aggravating circumstance beyond a reasonable doubt. Chanthabouly, 164 Wn. App. at 143. By challenging the sufficiency of the evidence, Baker admits the truth of the State's evidence and all reasonable inferences that may be drawn therefrom. State v. Salinas, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). Circumstantial evidence is equally probative as direct evidence. State v. Moles, 130 Wn. App. 461, 465, 123 P.3d 132 (2005).

To support the aggravator, the State relied on Kathie's particular vulnerability because, "[s]he was asleep in her bed," when she was killed. RP (Oct. 14, 2013) at 1070. Baker claims that lack of evidence indicating Kathie was asleep defeats the aggravator.

We disagree. Ample record evidence exists that Kathie was asleep at the time she was killed. Overwhelming physical evidence demonstrates Kathie was killed in her bed. Kathie's body lacked defensive wounds despite suffering multiple blows to the head and evidence of ligature strangulation. When her body was discovered, she was dressed in a nightshirt and shorts. Baker told an employee not to call again because Kathie was in bed.

Viewing this evidence in the light most favorable to the State, a rational trier of fact could have found that Kathie was particularly vulnerable because it shows she was in bed asleep when initially attacked with the first weapon. When the second attack occurred she was incapable of resisting since she was rendered incapable of resisting by the first attack.

Applicability of Aggravator

Baker argues that "[m]erely being asleep does not satisfy the particular vulnerability required to set apart one first degree murder offense as substantially more egregious than typical." Br. of Appellant at 31. He claims that planning and violence are inherent in committing first degree premeditated murder. In reply, he argues that since the murder involves planning, it is more likely the perpetrator will surprise the victim.

In establishing a particularly vulnerable person aggravator, the focus is on determining whether the victim was more vulnerable than other victims and whether the defendant knew of the particular vulnerability. State v. Barnett, 104 Wn. App. 191, 204, 16 P.3d 74 (2001). Courts have generally applied the particular vulnerability factor to victims who are vulnerable at the time the attack begins. Barnett, 104 Wn. App. at 204. But the aggravator has also been applied when a victim is rendered particularly vulnerable by their attacker. State v. Ogden, 102 Wn. App. 357, 366, 7 P.3d 839 (2000).

The reasons for an exceptional sentence must take into account factors other than those that are necessarily considered in determining the presumptive range for the sentence. State v. Chadderton, 119 Wn.2d 390, 395, 832 P.2d 481 (1992). "In other words, an enhanced sentence may not be based on those factors the legislature necessarily considered in setting the sentence range for the type of offense. Nonetheless, the trial court may base an enhanced sentence on other sorts of factors, including those the trial court considered in establishing the elements of the particular offense." Chadderton, 119 Wn.2d at 395.

To establish that the victim's vulnerability justifies an exceptional sentence, the State is required to show that (1) the defendant knew or should have known, (2) of the victim's particular vulnerability, and (3) that vulnerability was a substantial factor in the commission of the crime. State v. Gordon, 172 Wn.2d 671, 680, 260 P.3d 884 (2011).

Baker tries to distinguish State v. Baird, 83 Wn. App. 477, 488, 922 P.2d 157 (1996). Baird beat his wife with lead gloves until she was unconscious. While unconscious he disfigured her face by removing her eyelids and her nose. The sentencing court imposed an exceptional sentence for two reasons: the defendant acted with deliberate cruelty and his wife was particularly vulnerable because she was unconscious. The court upheld the particularly vulnerable aggravator on the basis that being unconscious was analogous to being asleep. Baird, 83 Wn. App. at 488-89.

Baker argues, unlike the present case, Baird involved a nonlethal injury. He claims that because first degree murder necessarily contemplates the victim's death, the legislature set the standard range for the offense fully cognizant that the victim would be incapacitated. We disagree. It is the vulnerability of the victim before the crime is carried out that supports the aggravating circumstance in this case.

Baker cites State v. Barnett, 104 Wn. App. 191, 16 P.3d 74 (2001). In Barnett, the jury found that a victim was particularly vulnerable because she was 17 at the time of the attack and home alone. Barnett, 104 Wn. App. at 205. Division Three of this court disagreed. The court explained that the victim fled, was involved in a prolonged chase, avoided Barnett's attempt to stab her, and was not incapacitated by the attack and thereby rendered vulnerable. The court found that Barnett selected the victim based on their failed relationship.

Baker argues that like the victim in Barnett, Kathie was not particularly vulnerable at the time of the attack because her vulnerability was not the substantial motivating factor. We disagree.

Barnett is readily distinguishable. The victim there was not incapacitated. She escaped after a long chase. Barnett, 104 Wn. App. at 203-04.

Sleep renders the victim particularly vulnerable to attack. In State v. Hicks, 61 Wn. App. 923, 812 P.2d 893 (1991), we found the particularly vulnerable victim aggravator applied to a 50-year-old rape victim who was attacked while sleeping. We reasoned that "[a]lthough her age was not advanced, because she was attacked as she slept, she was quickly rendered incapable of attempting to resist as compared to other rape victims who are awake and could, in some way, resist. Vulnerability in the circumstances presented here requires this type of comparison to determine its presence." Hicks, 61 Wn. App. at 931. We rejected Hicks' argument that since all those who are sleeping are vulnerable, there could be no "particular" vulnerability. Hicks, 61 Wn. App. at 931.

That Kathie was asleep when she was ruthlessly attacked constitutes a substantial motivating factor in the commission of the crime. To be a substantial factor, the condition must have rendered the victim more vulnerable to the particular offense than a non-vulnerable victim would have been. State v. Mitchell, 149 Wn. App. 716, 724, 205 P.3d 920 (2009). Like the victim in Hicks, that Kathie was asleep rendered her significantly more vulnerable to Baker's attack than an awake victim.

We are not persuaded by Baker's arguments. He is correct that planning is necessarily inherent in a charge of first degree premeditated murder, as is the notion

that the victim is ultimately incapacitated. But the particularly vulnerable person aggravator's focus is on whether the vulnerable condition affected the victim's ability to resist. As discussed above, the case law establishes that sleep is a proper basis for this aggravator in other contexts. A person need not be asleep or in bed to be a victim of premeditated murder. Therefore, sleep is not an element the legislature necessarily considered in setting the presumptive range for the offense and may be the basis for an aggravator. Under the circumstances here, the State established as a matter of fact and law, the particularly vulnerable person aggravator—Kathie was asleep when murdered.

Due Process Vagueness Doctrine

Baker next argues that the particularly vulnerable person aggravator violates constitutional due process vagueness doctrine. He relies on Blakely v. Washington, 542 U.S. 296, 124 S. Ct. 2531, 159 L. Ed. 403 (2004), to argue that "aggravating circumstances operate as elements of a higher offense which must be found by a jury beyond a reasonable doubt. . . ." Br. of Appellant at 35.

State v. Baldwin, 150 Wn.2d 448, 461, 78 P.3d 1005 (2003) controls. There, the Washington Supreme Court held that sentencing guidelines do not create a liberty interest protected by the due process clause because they are intended only to structure discretionary decisions affecting sentences and do not require a particular sentence be imposed. Baldwin, 150 Wn.2d at 1012.

Blakely involved the question of whether the facts authorizing a sentence above the statutory maximum must be determined by a judge or the jury. The Court held that under the Sixth Amendment jury trial right, a judge may not impose a sentencing

-23-

enhancement without either findings by the jury or a stipulation by the defendant. That inquiry is distinct from the constitutional vagueness doctrine, which implicates issues of public notice and preventing arbitrary state intrusion. State v. Smith, 111 Wn.2d 1, 4-5, 759 P.2d 372 (1988). Baker's due process vagueness challenge fails.

Ineffective Assistance of Counsel

Baker claims he received ineffective assistance of counsel at sentencing because he was represented by substitute counsel who had not participated in the trial, who did not subject the State's remarks to adversarial testing, and who did not advocate on his behalf. We agree.

Baker's assigned attorney was Thomas Pacher. On October 7, after the start of trial, Pacher unexpectedly failed to attend court due to illness.[7] He sent attorney Matthew Montoya to court to inform the court about his absence. The court asked Montoya whether he was able to proceed to trial. Montoya told the court that he "would certainly not be up to speed" and that he was "not at all" prepared to go forward. RP (Oct. 7, 2013) at 228. The court expressed justifiable displeasure at Pacher's impromptu absence. It warned Montoya that only a "serious medical condition" would justify Pacher's future absences. It instructed Montoya to warn Pacher that his absence due to mere illness was "unacceptable":

> So, naturally, it's a huge concern when this happens when we have a jury picked and waiting to resume with the trial after spending thousands of dollars selecting a jury and having a jury available. And so I just wanted to say that it is unacceptable to do this, to simply indicate that one is ill and one will not be in court. More, much more, is going to be needed in order for the Court to excuse any further absence.
>
> . . . .

---

[7] This was not the first time Pacher failed to appear in court as required. He was late one day and failed to appear another day.

I expect [Pacher] to be here each and every day on time unless there is some extremely serious medical condition that would absolutely preclude him from being here. Otherwise, he needs to be here and I want that message relayed to him.

RP (Oct. 7, 2013) at 238.

On October 14, the parties presented closing argument and the jury returned a verdict of guilty as charged.

After the jury was discharged, the court turned to scheduling of the sentencing hearing. It suggested the next day as appropriate for sentencing and the State and Pacher readily agreed to the day and time.

THE COURT: We will need to set a time for sentencing, and I would just like to note that I would like to do sentencing as quickly as possible. I wondered if the parties might be available tomorrow for sentencing?
MR. OHME: State's available, Your Honor.
THE COURT: Mr. Pacher.
MR. PACHER: I'll be available, Your Honor.
THE COURT: Okay. Would 9:30 be appropriate? I believe I am available at 9:30 tomorrow.
MR. OHME: That's okay with me, Your Honor.
MR. PACHER: Fine by me, Your Honor.
THE COURT: Okay. Very well.

RP (Oct. 14, 2013) at 1131-32.

The record shows that neither the State nor Pacher filed a presentencing report with the court.

On October 15, the morning of sentencing, Pacher inexplicably failed to appear. Montoya appeared instead and gave the court no explanation for Pacher's absence.

During the State's sentencing presentation, the trial deputy remarked that the courtroom was filled with Kathie's friends and family. He recounted Baker's criminal and probation violation history involving multiple sexual offenses against minors dating back to 1991. He told the court that Baker lied about obtaining a college degree. He

referred to Baker as a "monster," undeserving of leniency. He told the court that Baker "blatantly lied again and again" to save himself. He briefly described the brutality and viciousness of Kathie's murder.

He then urged the court to impose a sentence above the standard range of 240-320 months. He argued for 600 months plus 24 months for the deadly weapon enhancement, essentially a life sentence.

Seven family members and friends of Kathie made emotional pleas to the court to impose the maximum sentence.

When it came time for the defense presentation, Montoya made no objections and said nothing on behalf of Baker except, "No argument at this time, Your Honor." He informed the court that Baker declined to make any statements. The court told Baker of his right to allocution and asked if he wanted to exercise that right. Baker declined.

Before imposing sentence the court acknowledged receipt of letters written by Kathie's family members and friends.

The court recessed for 20 minutes to consider the sentence. Before imposing sentence the court briefly mentioned the comments in each letter. It also stated:

> The Court is appalled by what the defendant has done, and it is difficult to understand how any person could do what he did. Not only did he murder Kathie Hill in the most violent manner, he lied to Liza [sic] Schuldt about the situation. He had lied to Kathie Hill leading up to the crime. He lied to the police. And as the jury necessarily determined, he shamelessly lied and perjured himself in this court.

RP (Oct. 15, 2013) at 1158.

The court imposed the State's requested exceptional sentence of 624 months of confinement.

Criminal defendants are guaranteed effective assistance of counsel at all critical stages in a case. Strickland v. Washington, 466 U.S. 668, 685, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). Sentencing is a critical stage in a criminal case. State v. Bandura, 85 Wn. App. 87, 97, 931 P.2d 174 (1997).

In most cases, the law presumes an attorney's representation was competent and a defendant bears the burden of demonstrating a constitutional violation. See, e.g., State v. McFarland, 73 Wn. App. 57, 71, 867 P.2d 660 (1994). But in a narrow class of cases, exceptional circumstances are "so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified." United States v. Cronic, 466 U.S. 648, 658, 104 S. Ct. 2039, 80 L. Ed. 2d 657 (1984). Under Cronic, decided the same day as Strickland, prejudice may be presumed in three categories of cases: (1) where counsel is absent or prevented from assisting the defendant, (2) where counsel "entirely fails to subject the prosecution's case to meaningful adversarial testing"; or (3) where counsel is called upon to represent a client in circumstances under which no lawyer could provide effective assistance. Miller v. Martin, 481 F.3d 468, 472 (7th Cir. 2007) (quoting Cronic, 466 U.S. at 659-61); In re Pers. Restraint of Davis, 152 Wn.2d 647, 673-74, 101 P.3d 1 (2004). Under any of these three circumstances, there has been a denial of Sixth Amendment rights that makes the adversarial process itself presumptively unreliable. Cronic, 466 U.S. at 659.

Baker argues his case falls into the second class of cases in which counsel entirely failed to subject the prosecutor's case to adversarial testing. Over time, the scope of this category has narrowed. For example, the United States Supreme Court explained that the holding in Cronic only allows for the presumption of prejudice "'if

-27-

counsel <u>entirely</u> fails to subject the prosecution's case to meaningful adversarial testing.'" <u>Bell v. Cone</u>, 535 U.S. 685, 697, 122 S. Ct. 1843, 152 L. Ed. 2d 914 (2002) (quoting <u>Cronic</u>, 104 U.S. at 659). The Court reasoned for there to be a presumption of prejudice, "the attorney's failure must be complete." <u>Bell</u>, 535 U.S. at 697. Otherwise, the traditional <u>Strickland</u> test for ineffective assistance of counsel applies. <u>Bell</u>, 535 U.S. at 697.

An attorney's effective abandonment of a defendant at sentencing remains a circumstance under which prejudice may be presumed. In <u>Miller</u>, a defendant faced sentencing after being convicted in absentia for six counts of selling unregistered securities. Because the defendant's attorney incorrectly assumed that trial in absentia was a "nullity," he instructed the defendant to say nothing at sentencing and made no argument to the court. In subsequent habeas proceedings, the attorney admitted he made no presentation to the trial court and "did nothing." <u>Miller</u>, 481 F.3d at 471. The court concluded that the attorney's "advocacy at sentencing was so non-existent as to fall within even a very narrow exception." <u>Miller</u>, 481 F.3d at 473. The court rejected the State's contention that the silence was strategic, noting that "no discernable strategy was at work here." <u>Miller</u>, 481 F.3d at 473. The court concluded that prejudice should be presumed and remanded for resentencing. <u>Miller</u>, 481 F.3d at 472.

Other federal courts have reached the same conclusion under similar circumstances. In <u>Patrasso v. Nelson</u>, 121 F.3d 297 (7th Cir. 1997), a defendant's attorney performed no investigation and presented no mitigating evidence at sentencing. When asked at the sentencing hearing whether he had anything to say, the attorney said "I have nothing." When asked whether he would present mitigating

evidence, the attorney said "No. Court: Nothing." Patrasso, 121 F.3d at 303. The court concluded this constituted a complete failure of counsel warranting the presumption of prejudice.

In Tucker v. Day, 969 F.2d 155 (5th Cir. 1992), a defendant's attorney also said nothing at sentencing. According to the defendant, at one point he asked "Do I have counsel here?" The defendant claimed his appointed counsel responded "Oh, I am just standing in for this one." Tucker, 969 F.2d at 159. The court found that a presumption of prejudice was justified on the basis that the defendant's attorney failed to participate at all in the sentencing hearing. Tucker, 969 F.2d at 159.

The State does not dispute the facts. It does not respond to Baker's argument that the presumption of prejudice applies here given his counsel's deficient performance at sentencing. It argues that Strickland's analysis applies. Under that analysis, the State argues that Baker cannot demonstrate no strategic reason to remain silent or prejudice. We see no strategic reason for an attorney's complete silence at this sentencing under the facts presented here.[8] At the bare minimum, faced with the State's request for what amounts to a life sentence,[9] any competent attorney would have argued against an exceptional sentence and the length of the sentence.

We decline to apply Strickland here. This case falls squarely within that narrow category of cases where prejudice is presumed. Baker's stand-in attorney demonstrated no familiarity with this case. He had not participated in any part of the trial. We question whether he even discussed sentencing with Baker before sentence was imposed. He made no objections to the State's presentation, submitted no

---

[8] It's questionable why defense counsel agreed to a next-day sentencing date.
[9] Baker was 64-years-old when sentenced.

presentence report, and told the court that he had "no argument at this time." Standby counsel's complete lack of advocacy left Baker to go it alone. This failure is the equivalent of complete denial of counsel at sentencing. As the Supreme Court observed in Cronic, "The right to the effective assistance of counsel is thus the right of the accused to require the prosecution's case to survive the crucible of meaningful adversarial testing." 466 U.S. at 656. The State's arguments at sentencing were not subjected to any adversarial testing. We remand for resentencing so that Baker may be represented by constitutionally competent counsel.

Resentencing Before a Different Judge

Baker argues for remand to a different sentencing judge, claiming the trial court has already expressed its views on the disposition of the case in announcing the sentencing. The cases he relies on are inapposite.

In City of Seattle v. Clewis, 159 Wn. App. 842, 247 P.3d 449 (2011), a judge ordered the State to issue a material witness warrant before recusing himself. The court noted that remand before a different judge was the appropriate remedy if there was an appearance of unfairness, but found the issue moot because the judge recused himself. Clewis, 159 Wn. App. at 851.

In State v. Aguilar-Rivera, 83 Wn. App. 199, 203, 920 P.2d 623 (1996), resentencing was ordered before a different sentencing judge because the trial court announced its sentence before allowing the defendant the right of allocution. Aguilar-Rivera, 83 Wn. App. at 203.

In State v. Sledge, 133 Wn.2d 828, 947 P.2d 1199 (1997), a trial court concluded the defendant should be confined until his 18th birthday, and in fashioning a sentence

-30-

that would achieve this goal relied on a "speculative entitlement" to early release time. Sledge, 133 Wn.2d at 846. The Supreme Court remanded for a disposition hearing before a different judge "in light of the trial court's already-expressed views on the disposition." State v. Sledge, 133 Wn.2d at 846 n.9.

The record in this case does not establish that the trial court held a predetermined view of the case. The court's comments are typical of the judicial comments made in a superior court criminal case of this nature. We are confident that the experienced trial judge will fairly and properly sentence Baker on remand. We decline to grant the remedy requested by Baker.

## CONCLUSION

For the reasons discussed above, we affirm Baker's conviction. Because Baker's counsel at sentencing abandoned him by remaining silent, we presume prejudice. Accordingly, we remand to the trial court to resentence Baker with competent counsel to assist him.

We affirm the conviction and remand for resentencing consistent with this opinion.

WE CONCUR:

_Becker, J._

-31-