[No. 35019-6-I. Division One. September 9, 1996.]

THE STATE OF WASHINGTON, *Respondent*, v.
JAMES THOMAS BAIRD, *Appellant*.

478

*Starck M. Follis* and *Resick, Hansen & Follis*, for appellant.

*David S. McEachran, Prosecuting Attorney*, and *Laura D. Hayes, Deputy*, for respondent.

ELLINGTON, J. — One morning after James Thomas Baird and his wife, Susan, had coffee together, Baird followed Susan upstairs, beat her unconscious, then surgically disfigured her face. At trial, Baird offered evidence of an illegally-recorded conversation which Baird claimed triggered the assault. This case requires us to confront, for the first time, the competing interests involved when a criminal defendant offers evidence obtained in violation of the Privacy Act. Because we conclude that Baird's right to

present his defense was not compromised by exclusion of the evidence, and that other evidence rulings were correct, we affirm. We also affirm Baird's exceptional sentence, both on grounds of deliberate cruelty and because Susan was unconscious and therefore particularly vulnerable at the time of her disfiguring injuries.

## Facts/ Procedural Background

On February 9, 1993, at approximately five-thirty in the morning, Tom and Susan Baird had coffee together in their kitchen. After washing her hair in the kitchen sink, Susan went upstairs to dry it. While she was drying her hair, Baird entered the bathroom wearing lead-lined leather gloves and hit Susan on her chin. He hit her a few more times and the next thing she knew, he was offering to help her from the bathroom down the stairs. Baird told her he had called 911 and that the paramedics would be there soon.

When emergency personnel arrived, Susan was at the bottom of the stairs, holding a towel over her face, which was bleeding profusely. Baird claimed that Susan had fallen down the stairs, but the paramedics eventually realized that Susan's nose was missing and asked Baird if he knew where it might be. He at first expressed disbelief that it was missing, but eventually indicated he had thrown it in the woodstove. The medics and deputies could not find it in the stove, but they did find a charred leather glove.

All four of Susan's eyelids were sliced through, down to the eyeballs. Fortunately, her eyeballs were only minimally damaged. Doctors were unable to repair Susan's nose; all the cartilage and soft tissue were missing. She may be fitted with a prosthesis, but will never have a normal facial appearance.

Dr. Thomas Stackhouse, who operated on Susan Baird, testified at trial that he could not imagine her injuries occurring unless someone deliberately cut her eyelids while

carefully avoiding injury to the eyeballs. Dr. John Tisdall, an ophthalmologist who also treated Susan Baird and was present when Dr. Stackhouse operated on her, testified her injuries could not have been caused simply by slashing at the eyes with a knife: "They were a little too symmetrical on all four sides to be able to do that . . . I don't think I could stand back and be as symmetric about it as these were done."

Baird's defense was voluntary intoxication and diminished capacity. He attempted to introduce an illegally-taped telephone conversation between Susan and an unidentified man Baird believed to be her lover, not to prove that Susan was having an affair,[1] but rather to establish his state of mind at the time of the attack. He claimed the tape, in combination with the tremendous amount of alcohol he drank in the days before the attack, confirmed his suspicions about an affair and triggered the assault. His attorney argued the tape was critical to Baird's defense.

The State argued that the tape, and any reference to it, were inadmissible under the Privacy Act, because it was made without Susan's and the caller's consent. The trial court concluded the information on the tape was collateral to the issues before the jury and denied its admission.

The standard range for first degree assault for an individual without a criminal history, like Baird, was 93-123 months. The trial court imposed an exceptional sentence of 240 months, based upon its conclusion that Baird acted with deliberate cruelty and that Susan was particularly vulnerable because she was unconscious when Baird mutilated her face.

### The Tape Was Properly Excluded

■ Except under limited circumstances, Washington's Privacy Act prohibits recording of private telephone

---

[1]Indeed, the tape apparently recorded an innocuous conversation about property.

conversations without the consent of the parties being recorded. RCW 9.73.030. Any information obtained in violation of RCW 9.73.030 is inadmissible in any civil or criminal case. RCW 9.73.050. The purpose underlying these statutes is to protect privacy and prevent dissemination of illegally obtained information. *State v. Fjermestad*, 114 Wn.2d 828, 834, 791 P.2d 897 (1990); *State v. Flora*, 68 Wn. App. 802, 807, 845 P.2d 1355 (1992).

Baird makes no claim the Privacy Act does not apply. Nevertheless, he argues that constitutional considerations override the Act and require admission of the tape because without the evidence of the taped conversation and his reaction to it the day before the assault, his defense of diminished capacity was "hollow." Baird argues that exclusion of the tape or any mention of the conversation essentially denied him his right to testify in and present his own defense.

 The Supreme Court has held that under the Fifth, Sixth, and Fourteenth Amendments, a criminal defendant has an implicit constitutional right to testify in his own defense. *Rock v. Arkansas*, 483 U.S. 44, 53-55, 107 S. Ct. 2704, 97 L. Ed. 2d 37 (1987); *see also Stephens v. Miller*, 13 F.3d 998, 1002 (7th Cir. 1994), *cert. denied*, 115 S. Ct. 57, 130 L. Ed. 2d 15 (1994). But that right is not unlimited; a defendant's right to testify must sometimes bow to procedural and evidentiary rules that control the presentation of evidence. *Rock*, 483 U.S. at 55 n.11; *Stephens*, 13 F.3d at 1002. So, when a legitimate procedural or evidentiary rule limits a defendant's right to testify, the court must evaluate whether the interests served by the rule justify the limitation. *Rock*, 483 U.S. at 56; *Stephens*, 13 F.3d at 1002. Restrictions imposed by such rules may not be arbitrary or disproportionate to the purposes they are designed to serve. *Rock*, 483 U.S. at 56; *Stephens*, 13 F.3d at 1002. The question raised here is whether enforcement of the Privacy Act resulted in an unconstitutional limitation on Baird's right to present his defense.

Clearly the Privacy Act is a legitimate evidentiary rule.

Its purpose is straightforward: to preserve as private those communications intended to be private. Washington has recognized a strong policy of protecting the privacy of its citizens, and introduction of evidence obtained in violation of the statutes is prohibited. See *State v. Clark*, 129 Wn.2d 211, 222, 916 P.2d 384 (1996); see also *Peninsula Counseling Ctr. v. Rahm*, 105 Wn.2d 929, 933-35, 719 P.2d 926 (1986). This prohibition has often been enforced, although no Washington case has considered the question of a criminal defendant's constitutional right to present a defense. See, e.g., *State v. Flora*, 68 Wn. App. 802, 845 P.2d 1355 (1992); *State v. Henderson*, 16 Wn. App. 526, 557 P.2d 346 (1976).

We must thus balance the interests promoted in the statute against the interests of the defendant in offering the evidence. Against the privacy rights of Susan and her caller, and the general public policy of the Privacy Act, we must balance Baird's more fundamental constitutionally based right to present his defense. This requires us to examine the purposes for which Baird sought introduction of the protected evidence, and the likely effect on the outcome, to determine the effect of exclusion on his defense.

Baird argues on appeal that his hearing of the tape the day before the assault "triggered" the assault. The tape is not part of the record on appeal, but it is apparent from the record that the tape did not clearly show that Susan was having an affair. Rather, Baird and a friend concluded that it proved her infidelity from "the sweetness in [Susan's] voice" when she asked the caller "How are you?". But even assuming the tape could be interpreted to prove that Susan Baird was having an affair, or to give Baird reason for believing so, other evidence provided the same inference. Baird testified he had recently learned his wife was having an affair and that he and Susan were arguing about it that morning.

Baird presented two experts who testified he was probably experiencing an alcoholic blackout at the time of the

assault, and who described Baird as suffering from a paranoid personality disorder which caused him to believe things that were not true and not rational. Other testimony supported that of the experts, including evidence from police officers and paramedics. But neither expert indicated that a specific triggering event, such as hearing the tape, caused a psychological reaction such that Baird did not have the intent to commit the assault.

Baird's defense was that he did not intend to cause great bodily harm because he was impaired by his years of drinking and his paranoid personality disorder. In this evidentiary context, exclusion of the tape did not significantly constrict the vitality of his defense. Indeed, it is difficult to appreciate how the tape would have assisted Baird at all. At most, the tape represented an incident that confirmed Baird's paranoid belief in his wife's infidelity. That he was greatly affected by his "discovery" does not constitute a defense to assault. The question at trial was whether Baird had the requisite intent to cause great bodily harm. The evidence on this question was not limited by the exclusion of the tape. Certainly the tape was not so connected to the issue of guilt or innocence that its exclusion prevented Baird from relating his version of the events and thus affected the outcome of the trial. *See Stephens*, 13 F.3d at 1006 (Flaum, J., concurring).

The tape was merely collateral and, therefore, the interests served by the Privacy Act justify the limitation of Baird's right to present his defense. The tape was properly excluded.

## *Expert Testimony was Properly Admitted*

"If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." ER 702. Evidence is admissible under this rule

if (1) the witness qualifies as an expert and (2) the expert's testimony would be helpful to the trier of fact. *State v. Riker*, 123 Wn.2d 351, 364, 869 P.2d 43 (1994).

Opinion testimony may be admitted even if it addresses an ultimate issue to be decided by the trier of fact. ER 704. An expert witness, however, may not express an opinion about the guilt of the defendant, either directly or by inference. *State v. Cruz*, 77 Wn. App. 811, 814, 894 P.2d 573 (1995). The goal in prohibiting a witness from expressing an opinion about the defendant's guilt or innocence is to avoid having the witness tell the jury what result to reach. *Cruz*, 77 Wn. App. at 815.

Whether testimony constitutes an impermissible opinion about the defendant's guilt depends upon the circumstances in each case. *Cruz*, 77 Wn. App. at 814–15. Factors to consider include the type of witness, the specific nature of the testimony, the nature of the charges, the type of defense, and the other evidence presented. *Seattle v. Heatley*, 70 Wn. App. 573, 579, 854 P.2d 658 (1993), *review denied*, 123 Wn.2d 1011, 869 P.2d 1085 (1994). Opinions based solely upon inferences from the physical evidence and the expert's experience, and not based upon the defendant's credibility, may properly be admitted. *See Heatley*, 70 Wn. App. at 579. Opinions may be excluded under ER 403 if they are confusing, misleading, or if the danger of unfair prejudice outweighs their probative value. They also must be supported by a proper foundation. The decision to admit opinion testimony is within the discretion of the trial court. *Heatley*, 70 Wn. App. at 579, 585.

Baird claims that because neither doctor was qualified as an expert in the forensic evaluation of an injury, they should not have been allowed to testify that the injuries appeared to have been inflicted deliberately. He further argues that the doctors in effect improperly testified about his state of mind at the time of the assault, which was the ultimate question before the jury.

Under the circumstances of this case, the doctors'

statements that the cuts to Susan Baird were deliberate were permissible opinions. The doctors did not tell the jury what result to reach. Their opinions did not rely upon a judgment about the defendant's credibility, but rested upon their experience and training and treatment of Susan's injuries. The fact that the opinions support the jury's conclusion that Baird was guilty does not make them improper opinions on guilt. *See Heatley,* 70 Wn. App. at 579.

■ Nor were their statements improper for lack of foundation. Both doctors had performed surgery and, based upon their training and experience, were qualified to testify whether the cuts could have been made accidentally without injury to the eyes. Specific forensic training is not a prerequisite to such opinion evidence; indeed, an expert was not required to testify that surgical removal of Susan's nose and the symmetrical cuts through all four of her eyelids, without damage to the eyeballs, were deliberate. *See Heatley,* 70 Wn. App. at 580 (if a lay witness could express an opinion about an issue, there is no logic to limiting the admissibility of an expert's opinion on that issue).

Furthermore, nothing in the record suggests the doctors' opinions were more prejudicial than probative. The fact that the opinions implied guilt is the source of their materiality and relevance. *See Heatley,* 70 Wn. App. at 579, 582. The trial court did not abuse its discretion in admitting the doctors' opinions.

## *An Exceptional Sentence Was Justified*

■ Finally, Baird argues that his exceptional sentence was unjustified and was clearly excessive. An exceptional sentence will be upheld unless the reasons for it are not supported by the record or do not justify an exceptional sentence. RCW 9.94A.210(4); *State v. Ritchie,* 126 Wn.2d 388, 392, 894 P.2d 1308 (1995). If the reasons justify the exceptional sentence and are supported by the record, an exceptional sentence may be reversed only if the sentence

was "clearly excessive or clearly too lenient." RCW 9.94A.210(4). An exceptional sentence is "clearly excessive" only if it is " 'clearly unreasonable, i.e., exercised on untenable grounds or for untenable reasons, or an action that no reasonable person ·would have taken.' " *Ritchie*, 126 Wn.2d at 393, quoting *State v. Oxborrow*, 106 Wn.2d 525, 531, 723 P.2d 1123 (1986).

The two aggravating factors at issue in this case, deliberate cruelty and the particular vulnerability of the victim, have been declared by the Legislature to provide substantial and compelling reasons for an exceptional sentence. RCW 9.94A.390(2)(a) and (b). This court, therefore, need only determine whether those reasons are supported by the record and whether the sentence imposed is clearly excessive.

Deliberate cruelty means "gratuitous violence, or other conduct which inflicts physical, psychological or emotional pain as an end in itself." *State v. Smith*, 82 Wn. App. 153, 163, 916 P.2d 960 (1996). "The conduct must be violent, and atypical of the crime at issue." *State v. George*, 67 Wn. App. 217, 222, 834 P.2d 664 (1992), *review denied*, 120 Wn.2d 1023, 844 P.2d 1018 (1993), *overruled on other grounds*, 126 Wn.2d 388, 894 P.2d 1308 (1995).

A conviction for first degree assault requires the State to prove that the defendant intended to cause and did cause great bodily harm. RCW 9A.36.011. " 'Great bodily harm' means bodily injury which creates a probability of death, or which causes significant serious permanent disfigurement, or which causes a significant permanent loss or impairment of the function of any bodily part or organ.' " RCW 9A.04.110(4)(c). Baird argues the assault in this case is not more serious or egregious than the typical first degree assault.

We disagree. Had Baird only hit his wife with the lead gloves, causing great bodily harm, the assault may have been considered typical for assault in the first degree. Baird went far beyond that, however. He completely and deliberately removed her nose, then burned it, so it could

not be reattached. He sliced her eyelids, but carefully preserved her vision—ensuring that for the rest of her life, when Susan Baird sees her own reflection, she will see Baird's deliberate disfigurement of her face, which is beyond the ability of medical science to repair. Infliction of physical, emotional, and psychological pain as an end in itself could hardly be more clear. The trial court described Baird's mutilation of his wife as demonstrating "an intent to accomplish unusual cruelty as an end in and of itself." Baird's argument to the contrary is disingenuous.

The court also concluded that an exceptional sentence was warranted based upon Susan Baird's particular vulnerability. Although generally a victim is not considered particularly vulnerable except due to "extreme youth, advanced age, disability, or ill health,"[2] victims have been found to be particularly vulnerable or incapable of resistance because of being asleep. *See State v. S.H.*, 75 Wn. App. 1, 10, 877 P.2d 205 (1994), *review denied*, 125 Wn.2d 1016, 890 P.2d 20 (1995).

The trial court found Susan Baird was particularly vulnerable because she was unconscious when Baird cut off her nose. Baird argues that the finding that Susan was unconscious is not supported by the record. Baird is incorrect. Susan recalls being hit on the chin by the lead gloves. The next thing she knew, her husband offered to help her down the stairs and said he had called 911. A sheriff's deputy testified that when he attempted to talk to Susan about what had happened before she was taken to the hospital, she "was somewhere between incoherent and unconscious." She was not aware she had sustained any injuries other than those caused by the lead gloves until she woke up in the hospital recovery room. It is highly unlikely that Baird's careful "surgery" would have been possible had his wife been able to resist. The trial court's finding that Susan was unconscious when her face was mutilated therefore is supported by substantial evidence.

[2]RCW 9.94A.390(2)(b).

Baird also argues that it would set "a dangerous precedent" if this court concluded the victim was particularly vulnerable because of the assault itself. But a victim beaten unconscious and then further assaulted is surely no less vulnerable than a sleeping victim. The trial court, therefore, did not err when it concluded Susan was particularly vulnerable.

Finally, Baird argues that the length of his sentence is clearly excessive. He claims no reasonable person would impose a sentence in this case equivalent to a sentence normally reserved for first degree murder, and complains that the trial court failed to explain why a sentence within the standard range was inadequate. The Supreme Court rejected both arguments in *State v. Ritchie* after Baird's brief was filed. The sentence was not clearly excessive.

The decision of the trial court is affirmed.

BAKER, C.J., and KENNEDY, J., concur.

Reconsideration denied October 9, 1996.

Review denied at 131 Wn.2d 1012 (1997).