IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | | |
|---|---|---|
| THE STATE OF WASHINGTON, | ) | No. 78978-3-I |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | ORDER WITHDRAWING AND |
| | ) | SUBSTITUTING OPINION |
| MALEK KALID PTAH, | ) | |
| | ) | |
| Appellant. | ) | |

The panel has determined that the opinion filed on June 1, 2020 should be

withdrawn and a substitute opinion filed to correct a typo on page 12. Now,

therefore, it is hereby

ORDERED that the opinion filed on June 1, 2020 shall be withdrawn and a

substitute unpublished opinion shall be filed.

_Brennan, J_

_Verellen, J_                    _Dwyer, J._

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | | |
|---|---|---|
| THE STATE OF WASHINGTON, | ) | No. 78978-3-I |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| MALEK KALID PTAH, | ) | |
| | ) | |
| Appellant. | ) | |

BOWMAN, J. — Malek Kalid Ptah appeals his jury convictions of two counts of second degree assault with firearm enhancements and two counts of theft of a firearm. Ptah raises issues of prosecutorial misconduct, violation of his right to present a defense, ineffective assistance of counsel, and sentencing errors. We affirm Ptah's convictions but remand for the trial court to recalculate Ptah's offender score and determine whether he qualifies for waiver of the $100 DNA[1] fee.

## FACTS

Ptah faced a jury trial for charges resulting from events that occurred at the apartment of his friend Christina Seymour. Ptah raised self-defense and diminished capacity defenses. Testimony at trial described the events as follows.

---

[1] Deoxyribonucleic acid.

Citations and pin cites are based on the Westlaw online version of the cited material.

Ptah had a "traumatic" childhood marked by instability and sexual abuse. As an adult, he experienced significant mental health issues, including two involuntary hospitalizations. Ptah had consistent diagnoses of paranoia, schizotypal personality disorder, and substance abuse. His health records also contained occasional diagnoses of psychosis, bipolar disorder, delusional disorder, and post-traumatic stress disorder.

Seymour was one of the few significant relationships in Ptah's life. The two were like siblings and were godparents to each other's children. Ptah had a very close relationship with the two-year-old daughter Seymour shared with her boyfriend Quinton Hoard.

On the evening of December 23, 2016, Ptah went to visit Seymour at her apartment. Ptah and Seymour talked and shared some wine. Ptah spent the night.

The next morning on December 24, Hoard returned to the apartment after work. Hoard, who had a concealed weapons permit, showed Ptah the guns he had stored in a large black bag in Seymour's closet. Hoard kept the ammunition in the bag but in a separate, locked ammunition box. None of the guns were loaded. Seymour testified that Hoard had two assault rifles and three pistols—a .45, a pink .22, and a Glock.

According to Hoard, he showed Ptah his pink Sig Sauer Mosquito .22 caliber semiautomatic pistol, his black 9 mm Glock 19 handgun, his black Springfield XD Tactical .45 caliber handgun, and his AK-47 tactical rifle. Hoard planned to pawn some of the weapons for Christmas presents. Ptah expressed

2

interest in the pink Sig Sauer .22, wanting Hoard to give him the gun for protection. Hoard refused, telling Ptah he would need a background check. Ptah was adamant about wanting the gun but Hoard continued to refuse. Hoard testified, "I kept telling him no, no, no, he just kept getting a little more angry, a little more frustrated each time."

According to Ptah, Hoard also showed him his Del-Ton Sport AR-15 rifle and agreed to sell him one of the assault rifles. Ptah also testified that Hoard demonstrated that the pink .22 caliber handgun did not work. Hoard pointed the weapon at the ground and pulled the trigger repeatedly but it failed to fire. Ptah claimed that he, Hoard, and Seymour discussed Ptah holding onto the .22 because Ptah knew somebody who could fix the weapon.

Later that morning, Hoard went to work, leaving Ptah to spend time with Seymour and her daughter. Ptah testified that Seymour's daughter made a statement he interpreted to mean that Hoard had molested her. Ptah believed that Seymour heard and understood her daughter's statement as well.

Seymour did not believe Hoard had molested their daughter, but Ptah continued with the accusations. Ptah began making plans to get Hoard out of the apartment. Ptah testified that he told Seymour they needed to call the police. Ptah insisted that Seymour and her daughter could not stay in the apartment with Hoard. Ptah also decided to remove the firearms from the apartment. He devised a plan to put the guns in the car, call the police, then wait in the parking lot for Hoard and the police. Ptah claimed he wanted to separate Hoard from the guns so that Hoard could not shoot everyone when they accused him of

molesting his daughter. According to Ptah, Hoard had claimed he would shoot Seymour and others in the past.

Ptah testified that he and Seymour talked about this plan for several hours. They were going to take the guns down to the curb, put them in the trunk of the car, and call the police. Ptah said he believed Seymour agreed to the plan. Ptah testified that he and Seymour gathered all the guns and bullets into a bag. Ptah attached the Sig Sauer .22 caliber handgun to his hip.

Ptah testified that when he tried to take the bag out of the apartment, Seymour "flipped the script on me" and would not let him leave with the guns. Ptah and Seymour fought over the bag of guns. She grabbed his arm and tried to hit him. He claimed Seymour said she was going to shoot him and tried to retrieve a gun. Ptah tried to bite her and hold her back but she hit him multiple times on the head. He eventually pistol-whipped her once.

Seymour's testimony differed. According to her, Ptah was extremely agitated and concerned about the weapons in the closet and his suspicion that Hoard molested her daughter. She "play[ed] along" and agreed with his theories, hoping he would tire of the topic. But she never agreed to help him take the weapons. When Ptah began taking the guns out of the closet, Seymour said he could not leave with Hoard's property. Ptah would not listen, and they argued. The argument turned into a physical altercation. Ptah told Seymour he would pistol-whip her if she did not let him take the weapons. Seymour did not believe Ptah would physically hurt her. But as they "tussl[ed]" over the bag of weapons and Seymour refused to let go, Ptah "pulled out a pistol and started hitting" her

4

about the head and face. Seymour recalled that he struck her more than five times. Her daughter was nearby, "[s]creaming and saying no." When a neighbor knocked on the door, Ptah stopped hitting Seymour and left with multiple bags and the guns.

Seymour was bleeding, with contusions and cuts on her face. She called Hoard, who thought she was "playing" and did not believe that Ptah had assaulted her. When Seymour made a video call, Hoard saw the blood and quickly returned to the apartment. Seymour called the police.

Ptah testified that he walked out of the apartment elevator with the bags to find Hoard with a weapon in his hand. Ptah then drew the .22 from his waist to try to scare Hoard. Ptah testified that he believed the .22 was not operable. He aimed the gun toward the sill of the door next to Hoard to scare him. Ptah pulled the trigger, knowing the gun would not fire.

Hoard testified that he was walking toward the apartment building doors when he saw Ptah and asked, " 'What's going on.' " Ptah had the bags and held the .22 caliber pistol in his hand. Ptah said, " 'I gotta do this' " and cocked the gun. Hoard drew his gun and backed up until he was hiding behind a car in the parking lot. Hoard called the police from his hiding spot.

Police arrived to find Hoard pointing his gun toward the apartment building. Hoard was compliant with police demands, saying he would drop his weapon when Ptah dropped his. At that point, the officer noticed Ptah with the bags and guns at his feet. Both men put down their guns at the officer's command.

The police officer approached Ptah and saw a garbage bag and several other bags at his feet. Two assault rifles protruded from the garbage bag. A backpack contained the pink .22 caliber pistol and an AR-15 magazine.

Ptah willingly spoke with the police. He told the officer that he and Seymour planned to confront Hoard with accusations of molestation and then have him arrested. However, when Ptah began collecting the guns, Seymour appeared to change her mind and tried to prevent Ptah from taking the weapons. Ptah claimed that Seymour had punched him several times in the jaw and he retaliated by hitting her twice with the .22. He then left the apartment with the bags and guns. When Hoard arrived, Ptah put the magazine in the pistol, pointed it at Hoard, and pulled the trigger three times. The gun " 'clicked' " rather than fired.

Detectives noted concerns about Ptah's mental health. He was "very excited" while talking to responding officers. Kirkland Police Detective Brian Frankeberger testified, "The chronological order of things was kind of skewed, and he would talk over himself and then come back and then talk about a different part of the incident and then come back." Ptah testified that he was "[e]xcited" and "happy" when the police arrived because he believed his plan to secure the guns and have the police arrest Hoard had succeeded. Ptah told a detective, " 'You're lucky the motherfucker isn't dead, add that to your report.' "

The State charged Ptah with two counts of second degree assault of Seymour and Hoard while armed with a firearm and two counts of theft of a

6

firearm—"a pistol" and "an AR15 rifle" belonging to Hoard.[2] After several days of testimony, the jury convicted Ptah as charged. The trial court imposed a concurrent sentence within the standard range, two consecutive 36-month firearm enhancements, and legal financial obligations. Ptah timely appeals.

ANALYSIS

Prosecutorial Misconduct

Ptah argues the prosecutor committed misconduct during closing argument. He contends that the prosecutor improperly appealed to the jury's passion and prejudice, misstated the law of self-defense, and argued law not contained in the jury instructions.

To prove prosecutorial misconduct, a defendant must establish that conduct was both improper and prejudicial in the context of the entirety of the case. State v. Magers, 164 Wn.2d 174, 191, 189 P.3d 126 (2008). Where, as here, the defendant fails to object at trial, the error is waived absent misconduct so flagrant and ill intentioned that an instruction could not have cured the resulting prejudice. State v. Emery, 174 Wn.2d 741, 760-61, 278 P.3d 653 (2012). To demonstrate this level of misconduct, "the defendant must show that (1) 'no curative instruction would have obviated any prejudicial effect on the jury' and (2) the misconduct resulted in prejudice that 'had a substantial likelihood of affecting the jury verdict.' " Emery, 174 Wn.2d at 761 (quoting State v. Thorgerson, 172 Wn.2d 438, 455, 258 P.3d 43 (2011)).

---

[2] The State also charged Ptah with two counts of unlawful possession of a firearm in the second degree. The State asked and the court agreed to dismiss those counts at the beginning of the trial.

We review statements in a prosecutor's closing arguments in the context of the issues in the case, the total argument, the evidence addressed in the argument, and the jury instructions. State v. Boehning, 127 Wn. App. 511, 519, 111 P.3d 899 (2005). A prosecutor has wide latitude to draw reasonable inferences from the evidence during closing argument. Boehning, 127 Wn. App. at 519. "However, a prosecutor may not make statements that are unsupported by the evidence and prejudice the defendant." Boehning, 127 Wn. App. at 519.

I. Uncharged Crimes

Ptah claims the prosecutor improperly appealed to the jury's passion and prejudice by suggesting that the State could have charged Ptah with more than just two counts of theft of a firearm. We disagree.

References to dismissed or uncharged crimes may prejudice a defendant by inviting a jury to determine guilt based on improper grounds. See Boehning, 127 Wn. App. at 522; State v. Torres, 16 Wn. App. 254, 256, 554 P.2d 1069 (1976). For example, in Boehning, the prosecutor referred to three counts of rape during closing argument that had been dismissed at the close of evidence. Boehning, 127 Wn.2d at 517. The prosecutor's remarks were improper because dismissal of the charges was not evidence from which reasonable inferences and arguments about the charged crimes could be made. Boehning, 127 Wn. App. at 522. The purpose of the remarks was clearly to appeal to the passion and prejudice of the jury to infer guilt of the charged crimes. Boehning, 127 Wn. App. at 522. Similarly, in Torres, the State charged three codefendants with rape. Torres, 16 Wn. App. at 255. Two of the codefendants were also charged with

8

burglary. The prosecutor suggested during opening statement that the State could have charged the third codefendant with burglary as well. Torres, 16 Wn. App. at 256. This suggestion was not relevant to any issue at trial and improperly allowed the jury to infer the defendant's guilt on both charged and uncharged crimes.

This case differs from Boehning and Torres. The evidence in this case showed that Ptah took multiple firearms. But the State charged Ptah with theft of only two of the guns. To preserve jury unanimity, the prosecutor had to identify the two specific firearms the State intended to rely on as evidence of the thefts. See State v. Petrich, 101 Wn.2d 566, 572, 683 P.2d 173 (1984), abrogated on other grounds by State v. Kitchen, 110 Wn.2d 403, 756 P.2d 105 (1988); State v. Carson, 184 Wn.2d 207, 217, 357 P.3d 1064 (2015). The prosecutor identified those firearms and argued, "[I]n this particular case, the State charged two of the firearms. We didn't charge theft of all four; we just picked two of the firearms." He explained, "Did the defendant take the other ones? Yes. But the State elected to move forward on two counts of theft instead of multiple counts of theft. So those are the two it's referring to."

The prosecutor's statements were made in the context of explaining the "to convict" instructions for the two theft of a firearm counts and focused the jury on the firearms that the State elected to pursue as evidence of those counts. The argument was relevant to an issue at trial and did not amount to an improper appeal to the passion and prejudice of the jury.

9

II.  Law of Self-Defense

Ptah argues the prosecutor committed misconduct by misstating the law of self-defense as defined in the jury instructions.  According to Ptah, the prosecutor erroneously suggested that the self-defense instruction should apply to Hoard rather than Ptah.  We conclude that the prosecutor's analogy was a proper explanation of the law of self-defense.

To raise self-defense, the defendant must produce some evidence of reasonable apprehension of great bodily harm and imminent danger.  State v. Riley, 137 Wn.2d 904, 909, 976 P.2d 624 (1999).  Once properly raised, the burden shifts to the State to prove the absence of self-defense beyond a reasonable doubt.  State v. Kyllo, 166 Wn.2d 856, 862, 215 P.3d 177 (2009).

The trial court instructed the jury, in pertinent part:

> The use of force upon or toward the person of another is lawful when used by a person who reasonably believes that he is about to be injured in preventing or attempting to prevent an offense against the person, when the force is not more than is necessary.
> The use of force upon or toward the person of another is lawful when used in preventing or attempting to prevent a malicious trespass or other malicious interference with real or personal property lawfully in that person's possession, and when the force is not more than is necessary.

In closing argument, the prosecutor argued that the language of the instruction relating to defense of property would apply to Hoard if he had been charged, but does not apply to Ptah.  He encouraged the jury to "[g]o through the self-defense instruction" and argued that "a good application of that self-defense instruction is applied to Mr. Hoard."  He argued that Hoard's "property is being

stolen, so that self-defense instruction says he can use reasonable force to protect his property." The prosecutor later argued:

> You can't go and steal somebody's property and then claim self-defense when they are hanging on to [sic] the property that you're trying to steal. Can you imagine that? Go steal somebody's property and when they try to keep in from you, "Hey, I was just defending myself when I beat him up or shot him when I was stealing the property." It doesn't apply there.

The prosecutor also argued that the language of the instruction relating to lawful defense of person would apply to Hoard if he were charged, but does not apply to Ptah. The prosecutor told the jury that Ptah "has just beat up [Hoard's] girlfriend, is coming out with a firearm, points a firearm at him and tries to shoot him." He argued that the "self-defense instruction would say that Mr. Hoard could use reasonable force in order to defend himself in that situation." The prosecutor concluded by explaining, "[T]hat's how that instruction works. So if the State somehow tried Mr. Hoard for that offense . . . [,] you can see how it applies to Mr. Hoard. But that instruction does not apply in this case with regard to the defendant."

Ptah argues that "whether Hoard would hypothetically have been entitled to a self-defense instruction is irrelevant" because the charge of the jury is to "measure Ptah's conduct against the legal standard for when force is lawful." But the prosecutor's hypothetical was clearly an effort to do just that. The prosecutor contrasted Ptah's actions with Hoard's in an attempt to demonstrate that Ptah's conduct did not meet the legal standard of lawful force.

11

III. First Aggressor

Ptah also argues that the prosecutor committed misconduct by suggesting to the jury that Ptah could not raise self-defense because he was the first aggressor. Ptah contends that the prosecutor's argument was improper because the court did not provide the jury a first-aggressor instruction.

"Statements made during closing argument that pertain to the law must be confined to the law set forth in the instructions." State v. Souther, 100 Wn. App. 701, 714, 998 P.2d 350 (2000). A "first aggressor" instruction is appropriate "[w]here there is credible evidence from which a jury can reasonably determine that the defendant provoked the need to act in self-defense." Riley, 137 Wn.2d at 909-10.

The prosecutor argued:

[Hoard] was not the aggressor in this case. The defendant should be thankful that he's not shot, even though he tried to take the life of somebody else.
    So look through that self-defense instruction. First of all, it doesn't apply given the facts of this case because the defendant is the aggressor, and you can't be the aggressor and then use self-defense. It also doesn't apply because the force he used is totally unreasonable under the circumstances. But again, he struck [Seymour]. He tried to shoot Mr. Hoard. Self-defense does not apply. It would have applied to Mr. Hoard if he would have acted, but not to the defendant in this case.

Ptah mischaracterizes the prosecutor's argument. He did not argue that Ptah was the first aggressor—that Ptah provoked Hoard into assaulting him, creating the need for Ptah to act in self-defense. Rather, the prosecutor argued that Ptah was the only aggressor—that Ptah was not entitled to argue self-defense because he was not defending himself when he tried to shoot Hoard.

The State has the burden to prove the absence of self-defense. Kyllo, 166 Wn.2d at 862. The prosecutor's argument was not a misstatement of the law and was confined to the law as proscribed in the jury instructions.

Washington Privacy Act

Ptah contends the trial court erred in excluding recorded phone calls. We review a trial court's legal conclusions on a motion to suppress de novo. State v. Schultz, 170 Wn.2d 746, 753, 248 P.3d 484 (2011) (citing State v. Smith, 165 Wn.2d 511, 516, 199 P.3d 386 (2009)).

At trial, Ptah moved to admit the content of eight telephone calls he recorded from his cell phone. Seven of the calls involved Seymour. The eighth recording was a call between Ptah and Hoard. Ptah argued that the calls were admissible as impeachment evidence, as evidence of present sense impressions, and to show his then existing mental state.

The State moved to exclude the evidence pursuant to the Washington privacy act (WPA), chapter 9.73 RCW. The trial court excluded five of the calls with Seymour, concluding that she had not consented to the recordings. The court reserved ruling on two other recordings because it lacked sufficient information to determine whether Seymour consented. The court also reserved ruling on the call between Hoard and Ptah but later admitted the evidence.[3] Ptah did not renew his motion to admit the two recordings with Seymour. One of those calls consisted of a voicemail with Seymour's voice in the background.

---

[3] During Hoard's testimony, defense counsel offered the call between Hoard and Ptah, which the trial court admitted.

The other call contained Ptah rapping and reciting poetry and ends with Seymour saying someone threatened her, but she does not say who threatened her.

The WPA prohibits the recording of private communications without the consent of all parties. RCW 9.73.030(1). A recording violates the WPA if it captures "(1) a private communication transmitted by a device, which was (2) intercepted by use of (3) a device designed to record and/or transmit, (4) without the consent of all parties to the private communication." State v. Christensen, 153 Wn.2d 186, 191-92, 102 P.3d 789 (2004) (citing RCW 9.73.030(1)(a)). Any information obtained in violation of the WPA is inadmissible in criminal cases. RCW 9.73.050.

"A party is deemed to have consented to a communication being recorded when another party has announced in an effective manner that the conversation would be recorded." State v. Townsend, 147 Wn.2d 666, 675, 57 P.3d 255 (2002) (citing RCW 9.73.303(3)). Additionally, "a communicating party will be deemed to have consented to having his or her communication recorded when the party knows that the messages will be recorded." Townsend, 147 Wn.2d at 675.

Ptah claimed at trial and again on appeal that he announced to Seymour in an effective manner that he recorded all of their telephone calls. He points to one recording of a call with Seymour in which he complains about a conversation he had with his son's mother as evidence that Seymour consented. In that call, he told Seymour to " 'hear this conversation' " with his son's mother and then said, " 'You know my phone records everything.' " Seymour replied, " 'Ah, shit.' "

14

However, during a defense interview, Seymour explained that she thought Ptah's comment about recording calls on his phone referred to only his conversations with his son's mother. She was not aware that Ptah recorded her conversations with him as well.

Ptah fails to establish that Seymour consented to the recording of her conversations. Ptah's comment to Seymour in the context of a contentious conversation with his son's mother was not an "effective" announcement that he recorded all calls with Seymour. RCW 9.73.030(3); Townsend, 147 Wn.2d at 675. And the undisputed evidence shows that Seymour did not know that Ptah recorded their calls. Townsend, 147 Wn.2d at 675. Because Seymour did not consent to the recordings, they were inadmissible under RCW 9.73.050.

Right To Present a Defense

Ptah also raises a due process challenge to the exclusion of the recorded calls as an infringement of his right to present a defense. We review a constitutional issue de novo. State v. Jones, 168 Wn.2d 713, 719, 230 P.3d 576 (2010).

"The right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations." Chambers v. Mississippi, 410 U.S. 284, 294, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973). However, a defendant's right to present a defense is sometimes limited by the "procedural and evidentiary rules that control the presentation of evidence." State v. Baird, 83 Wn. App. 477, 482, 922 P.2d 157 (1996). In such cases, "the court must evaluate whether the interests served by the rule justify

15

the limitation. Restrictions imposed by such rules may not be arbitrary or disproportionate to the purposes they are designed to serve." Baird, 83 Wn. App. at 482.[4] This requires balancing the interests promoted by the evidentiary statute against those of the defendant in offering the evidence. Baird, 83 Wn. App. at 843. Evidentiary statutes cannot bar highly probative evidence essential to the defense. See Jones, 168 Wn.2d at 723-24.

In this case, the WPA controls the admission of the recorded calls. "Its purpose is straightforward: to preserve as private those communications intended to be private." Baird, 83 Wn. App. at 482-83. Washington has a long history of robust protection of private telephone communications. State v. Archie, 148 Wn. App. 198, 202, 199 P.3d 1005 (2009). We weigh this against Ptah's stated purpose for seeking admission of the recorded conversations— impeachment, present sense impression, and then existing mental state. In particular, Ptah argues the telephone calls were relevant to the jury in determining his state of mind as it pertained to his diminished capacity defense.

But Ptah had ample opportunity to present evidence of his state of mind without relying on the calls recorded in violation of the WPA. A mental health expert testified as to Ptah's state of mind and mental health. According to the expert, Ptah demonstrated schizotypal paranoid thinking, particularly when he concluded that Hoard was molesting Seymour's daughter. Ptah saw clues that only he understood and came to the conclusion of sexual abuse. This set into motion a series of choices that made sense only to Ptah. The expert described

---

[4] Citations omitted.

this as Ptah's "grandiose delusion" that he would "protect" Seymour and her daughter and save them from Hoard. This attempt to save Seymour and her daughter turned to "betrayal" when she refused to cooperate with the plan to remove the guns. The expert testified that the shock of this betrayal motivated Ptah to the confrontations with Seymour and Hoard. The expert opined, "[S]omeone with a full deck wouldn't act like this."

Ptah also testified in detail about his mental state at the time of the incident. Ptah detailed his difficult childhood and the sexual abuse he experienced, which made him hypervigilant. He described his worry that his son was being molested and his belief that Hoard was molesting Seymour's daughter. He expressed his concerns about Hoard having weapons and his fears for the safety of Seymour and her child. He talked about formulating the plan with Seymour and her change of heart. He described feeling "happy" when the police arrived because he thought the plan had succeeded. Police officers also described their observations of Ptah and mental health concerns.

Given this extensive testimony, the recorded calls had little additional probative value as to Ptah's mental state at the time of the incident. Exclusion of the calls did not prevent Ptah from presenting his diminished capacity defense.

Ineffective Assistance of Counsel

Ptah claims his trial counsel was ineffective for failing to object to the prosecutor's improper closing argument and for failing to renew Ptah's motion to admit recorded calls with Seymour. To succeed on a claim of ineffective assistance of counsel, the defendant must demonstrate that defense counsel's

17

representation fell below an objective standard of reasonableness and the deficient representation resulted in prejudice. State v. McFarland, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995). "When counsel's conduct can be characterized as legitimate trial strategy or tactics, performance is not deficient." Kyllo, 166 Wn.2d at 863.

As discussed above, the prosecutor's closing argument was not an attempt to appeal to the passion and prejudice of the jury, did not misstate the law, and did not stray from the law as provided in the jury instructions. Accordingly, failure to object to the argument does not amount to deficient representation.

Neither was counsel's failure to renew Ptah's motion to admit recordings of his telephone calls deficient. The recordings had little probative value. Discussion during the motion in limine shows confusion about the content and significance of the calls. The State expressed concern that the conversations would confuse the jury. Given the minimal probative value, the likelihood of confusion, and the ample additional evidence of Ptah's mental state, counsel's failure to revisit the evidence does not amount to ineffective assistance.

Sentencing Issues

Ptah requested an exceptional sentence. He asked the court to "forego the firearm enhancements" and impose standard-range concurrent sentences for each count. He also asked the court to find that the two convictions for theft of a firearm constitute the same criminal conduct for the purpose of calculating his offender score. The trial court denied both of Ptah's requests and sentenced him

18

to concurrent standard-range sentences on each count and two consecutive 36-month firearm enhancements. The court waived all nonmandatory legal financial obligations and ordered Ptah to pay restitution, the $500 victim penalty assessment, and the $100 DNA collection fee. Ptah appeals.

We review a sentencing court's decision for abuse of discretion or misapplication of the law. State v. Delbosque, 195 Wn.2d 106, 116, 456 P.3d 806 (2020). A trial court abuses its discretion when its decision is manifestly unreasonable or based on untenable grounds. Delbosque, 195 Wn.2d at 116. A failure to exercise discretion is also an abuse of discretion. State v. Stearman, 187 Wn. App. 257, 270, 348 P.3d 394 (2015). Interpretation of a statutory provision is a question of law we review de novo. State v. Haddock, 141 Wn.2d 103, 110, 3 P.3d 733 (2000).

### I. Firearm Enhancements

Ptah argues the trial court failed to recognize that it had discretion to "forego" imposing consecutive sentences for the firearm enhancements. In support of his contention that the trial court had discretion to impose concurrent sentences for the firearm enhancements, Ptah cites to In re Personal Restraint of Mulholland, 161 Wn.2d 322, 166 P.3d 677 (2007), and State v. McFarland, 189 Wn.2d 47, 399 P.3d 1106 (2017). Both cases are inapposite.

Mulholland addressed the court's discretion in sentencing multiple serious violent offenses. Mulholland, 161 Wn.2d at 327. Under RCW 9.94A.589(1)(b),[5] multiple serious violent offenses are served consecutive to each other. In

---

[5] We note the legislature recently amended RCW 9.94A.589. LAWS OF 2020, ch. 276, § 1. The amendments do not affect the analysis throughout this opinion.

Mulholland, the court concluded that the explicit language of RCW 9.94A.535[6]

gives trial courts discretion to impose concurrent sentences for serious violent

offenses. Mulholland, 161 Wn.2d at 329-30.

In McFarland, the court considered whether the language in RCW

9.94A.535 also authorized discretion to depart from the requirement that courts

impose consecutive sentences for multiple "firearm-related" offenses under RCW

9.94A.589(1)(c). McFarland, 189 Wn.2d at 52-53. It concluded that there was

"no statutory basis to distinguish between the consecutive sentencing language

in these two subsections." McFarland, 189 Wn.2d at 53.

Neither Mulholland nor McFarland addressed firearm enhancements.

Firearm enhancements are added to a standard-range sentence and are

governed by RCW 9.94A.533(3). The imposition of firearm enhancements is

mandatory:

> Notwithstanding any other provision of law, all firearm
> enhancements under this section are mandatory, shall be served in
> total confinement, and shall run consecutively to all other
> sentencing provisions, including other firearm or deadly weapon
> enhancements, for all offenses sentenced under this chapter.

RCW 9.94A.533(3)(e).

The explicit language of RCW 9.94A.533(3)(e) requires the imposition of

firearm enhancements and mandates that they run consecutive to all other

sentencing provisions and to each other. Unlike the consecutive sentence

statute at issue in Mulholland and McFarland, RCW 9.94A.535 does not provide

---

[6] RCW 9.94A.535 provides the guidelines for imposing an exceptional sentence and states, in pertinent part, "A departure from the standards in RCW 9.94A.589 (1) and (2) governing whether sentences are to be served consecutively or concurrently is an exceptional sentence subject to the limitations in this section."

authority to depart from the mandates of the firearm enhancement statute. "[J]udicial discretion to impose an exceptional sentence does not extend to a deadly weapon enhancement in light of the absolute language of [RCW 9.94A.533(3)(e)]." State v. Brown, 139 Wn.2d 20, 29, 983 P.2d 608 (1999), overruled on other grounds by State v. Houston-Sconiers, 188 Wn.2d 1, 391 P.3d 409 (2017).[7]

### II. Same Criminal Conduct

In general, offender score calculations include all current and prior convictions. RCW 9.94A.589(1)(a); see State v. Roose, 90 Wn. App. 513, 515-16, 957 P.2d 232 (1998). However, multiple current offenses encompassing the same criminal conduct count as one crime. RCW 9.94A.589(1)(a); see State v. Tresenriter, 101 Wn. App. 486, 496, 4 P.3d 145 (2000). RCW 9.94A.589(1)(a) defines "same criminal conduct" as "two or more crimes that require the same criminal intent, are committed at the same time and place, and involve the same victim." If one of these elements is missing, the sentencing court must count the offenses separately in the offender score. Haddock, 141 Wn.2d at 110.

Ptah argues that his two convictions for theft of a firearm constitute the same criminal conduct for the purpose of calculating his offender score. He contends that the trial court abused its discretion by failing to conduct a same-criminal-conduct analysis. The State concedes this error, but the parties

---

[7] In Houston-Sconiers, our Supreme Court concluded that the Eighth Amendment to the United States Constitution requires that courts sentencing juveniles must have discretion to consider the mitigating circumstances of youth and held that "[t]o the extent our state statutes have been interpreted to bar such discretion with regard to juveniles, they are overruled." Houston-Sconiers, 188 Wn.2d at 21, 9 (footnote omitted). Ptah makes no argument that he was a juvenile offender at the time of his sentencing.

disagree as to the proper remedy on appeal. Ptah contends that we should determine whether the crimes constitute the same criminal conduct and remand for recalculation of his offender score and resentencing. The State argues that we should remand for the trial court to conduct a same-criminal-conduct analysis. We agree with Ptah.

"Deciding whether crimes involve the same time, place, and victim often involves determinations of fact." State v. Graciano, 176 Wn.2d 531, 536, 295 P.3d 219 (2013). But "when the underlying facts are undisputed, the determination of same criminal conduct may be resolved as a matter of law." State v. Hatt, 11 Wn. App. 2d 113, 141, 452 P.3d 577 (2019), review denied, 195 Wn.2d 1011, 460 P.3d 176 (2020). Here, the facts are not in dispute. The record clearly establishes that Hoard was the victim of both thefts and that the thefts occurred simultaneously at Seymour's apartment. We conclude that the theft of firearm convictions constitute the same criminal conduct for the purpose of calculating Ptah's offender score. See Tresenrieter, 101 Wn. App. at 497. We remand to the trial court for recalculation of Ptah's offender score.

### III. DNA Fee

Ptah claims that the trial court erroneously imposed a $100 DNA fee without consideration of whether his mental health conditions impact his ability to pay the fee. The State properly concedes error based on RCW 9.94A.777(1) and State v. Tedder, 194 Wn. App. 753, 756-57, 378 P.3d 246 (2016). We remand for the trial court to consider Ptah's ability to pay.

Statement of Additional Grounds

Ptah submitted a statement with several additional grounds for relief. We address these to the extent we can discern his legal arguments.

I. Mental Illness

Ptah argues he did not receive adequate accommodations for his mental illness. In particular, he claims his mental illness required the court to appoint a guardian ad litem (GAL) under RCW 4.08.060. However, RCW 4.08.060 pertains to only civil cases. Similarly, Ptah cites to King County Superior Court's mental proceeding rules allowing for GAL appointment in commitment hearings. See LMPR 1.7. These rules are also inapplicable in the criminal context.

Ptah also claims rights under chapter 10.77 RCW. Ptah's mental illness did not entitle him to the rights and procedures for the criminally insane as defined in that chapter.

II. Ineffective Assistance of Counsel

Ptah argues that his attorney was ineffective because he failed to convince the court to admit his recorded telephone calls. He claims his attorney "[led] me to believe" that the evidence was "Gold," creating the expectation that the recordings would be admitted. The trial court properly excluded the recorded phone calls pursuant to the WPA. Counsel's inability to admit the evidence was not deficient.

We affirm Ptah's convictions for two counts of theft of a firearm and two counts of assault in the second degree with firearm enhancements but remand

for the trial court to recalculate Ptah's offender score and determine whether he qualifies for waiver of the $100 DNA fee.

WE CONCUR: